AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

UNITED STATES DISTRICT COURT
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

for the
District of New Mexico

DEC 0 2 2015

MATTHEW J. DYKMAN

CLERK

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   15 mr 804 |
| 1811 Vista del Valle Española, New Mexico | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Judicial_____ District of _____New Mexico_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2 & 922(g)(1) | Aiding and Abetting; Felon in Possession of a Firearm |
| 21 U.S.C. § 841 & 846 | Distribution of Heroin; Conspiracy to Distribute Heroin |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Thomas C. Neale, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: December 2, 2015

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

Karen B. Molzen, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Thomas C. Neale, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search certain premises and vehicles; further described in Attachment A, for the things described in Attachment B. This affidavit seeks a search warrant to obtain evidence of violations of: 21 U.S.C. § 841 Distribution of Heroin, 21 U.S.C. § 846 Conspiracy to Distribute Heroin, 18 U.S.C. § 922 (g)(1) Felon in Possession of a Firearm, and 18 U.S.C. § 2 Aiding and Abetting.

#### Background of Affiant

2.      I have been a law enforcement officer for approximately 6 years and am currently employed as a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). Prior to becoming a Special Agent with the FBI, I was a police officer in Richmond, Virginia. I have received formal training from the FBI and the Richmond, Virginia Police Department in basic law enforcement skills and narcotics investigations.

3.      Since 2009, I have participated in dozens of investigations of drug distribution. My investigative experience includes, but is not limited to, conducting surveillance, coordinating controlled purchases of narcotics, interviewing subjects and witnesses, debriefing narcotics users and sellers, writing affidavits for and executing search warrants, supervising cooperating sources, issuing subpoenas, and analyzing phone records and social media accounts. Through my training and experience, I am familiar with methods used by individuals to purchase, transport, store, and distribute controlled substances. I have qualified on numerous occasions as an expert witness in state courts on charges related to possession with intent to distribute controlled substances. As a result of these experiences, I have learned the following:

4.      Individuals involved in the distribution of controlled substances often conceal evidence of their activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to the drugs and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas or mobile storage containers. Individuals involved in illegal drug distribution of narcotics often keep quantities of controlled substances

1

on their person. This evidence, which is discussed in detail in the following paragraphs, includes drugs, paraphernalia for weighing, packaging, and distributing drugs, records and ledgers pertaining to drug transactions, and proceeds (currency, merchandise purchases, etc.) from drug sales.

5.      I am aware that narcotics distributors often keep and use weapons (including rifles, shotguns, and handguns) and ballistic vests (similar to what is used by law enforcement) as tools of their trade.

6.      Individuals involved in the distribution and possession of controlled substances possess items of identification (including but not limited to driver's licenses, rent receipts, bills, and address books). These items are relevant to the identity of the possessor of the controlled substances, possessor of other items seized, and occupants of the premises or vehicles searched.

7.      Individuals involved in the distribution of controlled substances hide narcotics in many places, including but not limited to, safes, lock boxes, vaults, inner walls, secret compartments, bathroom utilities, mattresses, vehicles, vehicle parts, outbuildings, and adjoining structures. I am seeking to search all areas of the premises, but know from experience that suspect(s) may not cooperate with agents. Should the defendants and/or other suspects fail to provide agents with a key or combination to said containers, agents will utilize a cutting device to access said containers.

8.      I am aware that narcotics distributors use other methods beyond simply concealing their activities to thwart law enforcement intervention or entry. These methods include reinforcing doors and windows to their residences with commercially-available materials and installing surveillance cameras.

9.      Individuals involved in the distribution of controlled substances collect proceeds from the sales and/or distribution of drugs, which include not only currency but items taken in trade or purchased with proceeds earned through illicit activities. I am aware that these individuals may keep currency earned through illicit activities on their persons or concealed in any of the aforementioned places.

10.      Individuals involved in drug distribution commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials such as plastic baggies, plastic wrap, vacuum-seal bags, aluminum foil, electrical tape, duct tape, packing tape, rubber bands, and scales to weigh controlled substances. Narcotics distributors commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

11.      Through my training and experience, I also know that drug distributors often utilize multiple cellular telephones to conduct their drug-related activities and that they frequently change their phone numbers. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to direct further their illicit activities, photographs and videos of controlled substances, drug proceeds, and firearms.

2

12.     Drug distributors often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open, the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates.  These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form.

13.     Through my training and experience, I am also aware that members of gangs may create and maintain documentation – in print or electronic form - pertaining to gang-related membership rosters, "green light"/disciplinary lists, murder/assault lists, moniker or alias lists, promotion lists, inmate lists, money order/wire transfer receipts, shipping/mailing receipts, accounting and narcotics ledgers, address/telephone number lists, letters, police reports, and legal documents.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

14.     Beginning in March 2015, the FBI, in conjunction with the New Mexico Corrections Department ("NMCD") and the Bernalillo County Sheriff's Office ("BCSO") launched an investigation into criminal affairs of the Syndicato de Nuevo Mexico Gang ("SNM Gang") within the District of New Mexico and elsewhere. Although the SNM Gang has historically been on law enforcement radar, the current investigation began in early 2015 when leaders of the SNM Gang called for the murder of two high ranking administrators within the NMCD. The investigation has involved the interception of wire communications, recorded conversations by confidential human sources and undercover agents, and a historical review of crimes committed by the SNM Gang, dating back to the mid-1980s.

15.     To date, the investigation has yielded evidence of SNM Gang members participating in more than two-dozen homicides, numerous attempted murders and aggravated assaults, as well as money laundering, drug trafficking, and other felony crimes that are being investigated as violations of the Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. § 1961–1968.

16.     In the paragraphs that follow, I have detailed one aspect of the of the overall investigation that pertains to the drug trafficking activities of Matthew Dion MARTINEZ, AKA "Goat," who resides at 1811 Vista del Valle, Española, New Mexico, (hereafter referred to as the "Subject Premises"). MARTINEZ is a validated SNM Gang member.

17.     The Subject Premises can be described as a single-story, detached home with beige siding, white trim, and a white front door.  The Premises is surrounded by a concrete brick wall with a

3

black gate.  The search is to include all rooms, attics, and other parts within the residence and its curtilage, to include all vehicles, trash containers and storage areas.  There are no house numbers visible on the exterior, however as one enters the Vista del Valle community from El Llano Road, the Premises is the last house on the left (see Paragraph 27).  Color photographs of the Subject Premises have been attached to Attachment A and incorporated herein.

18.    Because this affidavit is being submitted for the limited purpose of seeking a search warrant for an individual location and subject, I have not set forth each and every fact learned during the course of this investigation.  I have set forth only the facts that I believe are necessary to establish the foundation for an order authorizing the requested search warrant.


**Heroin Trafficking:**

19.    Over the course of the SNM Gang investigation, case agents received information indicating an SNM Gang member Matthew MARTINEZ, AKA "GOAT," was selling heroin from the Subject Premises. Additional information from the New Mexico Department of Corrections indicated that "Goat" was a validated member of the SNM Gang.  Based on that intelligence information, case agents utilized two Confidential Human Sources (hereafter referred to as "CHS1" and "CHS2") and a law enforcement Undercover Employee (hereafter referred to as "UCE") to make controlled drug buys from MARTINEZ.

20.    CHS1 is an informant for the FBI and has conducted multiple controlled drug buys in furtherance of the FBI's investigation into the SNM Gang.  Case agents have worked with CHS1 for approximately seven months and CHS1 has never given false or misleading information, nor have they been given reason to doubt CHS1's credibility. CHS1's primary motivation for assisting law enforcement has been to help rid the community of gangs and drug dealers, as well as monetary gain.  CHS1 has been convicted of Trafficking Heroin (2001, 2002) and Trafficking a Controlled Substance (2004).

21.    CHS2 is an informant for the FBI and the New Mexico Corrections Department.  Case agents have worked with CHS2 for approximately eight months and CHS2 has never given false or misleading information, nor have they been given reason to doubt CHS2's credibility.  CHS2's primary motivation for assisting law enforcement has been to help rid the community of gangs and drug dealers, as well as monetary gain. CHS2 has been convicted of Aggravated Burglary (1997), Forgery (1997), Criminal Damage (1997), Resisting (1997), Assault on a Peace Officer (1998, 1998), Motor Vehicle Theft (1998), Resisting (1998), Aggravated Burglary (1998), Forgery (1998), Property Damage (1998), Resisting (1998), Aggravated Assault on a Peace Officer (2004), Parole Violation (2004), and 2nd Degree Murder (2005).

22.     On April 30, 2015, CHS1 spoke with MARTINEZ via telephone and agreed to purchase a quantity of heroin and several ballistic vests from MARTINEZ.  CHS1 met MARTINEZ and his wife, Cassandra MARTINEZ, at a restaurant in Albuquerque.  MARTINEZ told CHS1 that he needed to retrieve the heroin from his rectum, went to the restaurant restroom, and returned with approximately 15.2 grams of heroin, which he provided to CHS1.  MARTINEZ and CHS1 then went to MARTINEZ'S vehicle in the parking lot.  MARTINEZ retrieved four black UniKorp ballistic vests from his vehicle and provided them to CHS1.  CHS1 gave MARTINEZ "official funds" for the vests and heroin.  MARTINEZ instructed CHS1 to travel to the Subject Premises the following day to purchase additional heroin.  CHS1 advised that MARTINEZ often kept heroin in his rectum to avoid detection by law enforcement.

23.     On May 1, 2015, CHS1 spoke again with Matthew MARTINEZ and Cassandra MARTINEZ about purchasing heroin; they instructed CHS1 to go to the Subject Premises.  CHS1 met with both Matthew and Cassandra MARTINEZ at the Subject Premises and exchanged "official funds" for approximately 58.5 grams of heroin.

24.     On August 31, 2015, Matthew MARTINEZ was arrested with Anthony MARTINEZ (relationship unknown) in Arizona pursuant to a traffic stop by the Arizona Department of Public Safety on Interstate-40.  In addition to a small amount of suspected narcotics in the vehicle, the investigating officers located approximately $3299 folded and rubber-banded inside of a gallon-sized freezer bag in the glove box and a ballistic vest.  Matthew MARTINEZ told the arresting trooper that the currency belonged to his mother and that they were enroute to purchase a new vehicle; Anthony MARTINEZ said that he uses the vest during hunting trips.  The trooper noted in his report that Anthony and Matthew provided conflicting details about the type of vehicle they were going to purchase, from whom, and where they had departed from.

25.     In September, 2015, CHS2 introduced the UCE to Matthew MARTINEZ for the purpose of purchasing heroin.  On September 16, 2015, the UCE spoke to Matthew MARTINEZ via telephone; MARTINEZ confirmed that he had heroin for sale.  The UCE met with MARTINEZ and a female, identified by MARTINEZ as his wife, at a parking lot in Santa Fe and exchanged "official funds" for approximately 49.9 grams of heroin; MARTINEZ and the female arrived together in the same vehicle.  MARTINEZ also told the UCE that he would sell additional ounces of heroin to the UCE at a cheaper price if the UCE agreed to sell for MARTINEZ in Albuquerque, New Mexico.  Subsequent to the exchange, surveillance officers observed MARTINEZ and the female return to the Subject Premises.

26.     During each controlled purchase involving CHS1 and CHS2, agents followed certain protocols and procedures to ensure the buys were "controlled" by the agents and the evidence was

properly collected[1]. The amount purchased during each controlled buy was a quantity recognized as an amount consistent with "sales," as opposed to a "user" amount. The heroin purchased from Matthew MARTINEZ on each of the controlled buys tested positive for heroin via examinations with field test kits. The drug exhibits were then booked into evidence and sent to the State of New Mexico laboratory for further analysis; these analyses confirmed each purchased exhibit is heroin.

27.     In November 2015, I conducted a search of the Santa Fe County, New Mexico Property records and found that Matthew and Cassandra MARTINEZ own the Subject Premises. These results included an aerial image of the property, confirming the location and description in Paragraph 17.

28.     On November 24, 2015, I conducted surveillance on the Subject Premises. Over the course of approximately 35 minutes, I observed two vehicles pull up to the Subject Premises and leave shortly thereafter (approximately 1 minute and 10 minutes, respectively). Although from my vantage point I was unable to determine if the vehicles' occupants had any interaction at the Subject Premises, based on my training and experience the presence of multiple, brief visits by different vehicles is indicative of narcotics distribution. I also observed a male fitting Matthew MARTINEZ'S description leave the driveway adjacent to the Subject Premises on a 2005 Harley Davidson motorcycle (New Mexico license plate R70255). This motorcycle is registered with the New Mexico Motor Vehicles Department to Matthew and Cassandra MARTINEZ.

29.     Within the past 48 hours, CHS1 spoke with Matthew MARTINEZ, who confirmed that he would have heroin for sale throughout the week and CHS1 could come to the Subject Premises to purchase. CHS1 also advised case agents that he/she has observed handguns under MARTINEZ'S bedroom mattress.

30.     A review of Matthew MARTINEZ'S criminal history indicated that he is a convicted felon and has been arrested for Burglary (2001), Trafficking Heroin (2005, 2007), Possession of Hydrocodone, Methadone, and Diazapan (2005), Possession of Cocaine, Methadone, and Valium (2007), Residential Burglary (2005), Possession of a Controlled Substance (2009, 2010, 2010), Driving Under the Influence of Liquor (2009), and Tampering with Evidence (2007).

31.     A review of Cassandra MARTINEZ'S criminal history indicated that she has been

---

[1] Each controlled buy was initiated with agents establishing pre-buy surveillance on the proposed meeting location. Prior to each controlled buy, agents searched the CHS and the CHS's vehicle for contraband. A similar search of the CHS and the CHS's vehicle were conducted after each controlled buy. Every search of the CHS for contraband yielded negative results. The CHS wore a covert recording device during each buy and the recordings were downloaded and maintained by the FBI. Agents followed the CHS to and from every controlled buy and maintained surveillance, to the fullest extent possible, on the CHS throughout the buys. Following every buy, agents followed the CHS to a pre-determined location and recovered contraband from the CHS. As previously stated, the CHS and CHS's vehicle were searched after the buy. The CHS was then de-briefed on what had occurred during the controlled buy and the recording device was recovered.

arrested for Battery Against a Household Member (2000, 2005), Failure to Appear (2004), Possession of a Controlled Substance (2011), and Resisting, Evading, or Obstructing an Officer (2011).

**CONCLUSION:**

32.    Based on the foregoing, I believe that there is probable cause to conclude that evidence of violations of 21 U.S.C. § 841, 21 U.S.C. § 846, 18 U.S.C. § 2, and 18 U.S.C. § 922(g)(1) as more particularly described in Attachment B will be found at the Subject Premises, on the subject, and in the subject's vehicles.  Therefore, I submit that this affidavit supports probable cause for a warrant to search the premises described in Attachment A and seize the items described in Attachment B.

33.    This affidavit has been reviewed by FBI Chief Division Counsel Anthony Costanza and Assistant United States Attorney Shana Long of the District of New Mexico.

Respectfully submitted,

Thomas Neale
FBI Special Agent

Subscribed and sworn to before me on December 2nd, 2015:

Karen B. Molzen
United States Magistrate Judge

7

# Attachment A

### Premises to be Searched

The Subject Premises can be described as a single-story, detached home with beige siding, white trim, and a white front door. The Premises is surrounded by a concrete brick wall with a black gate. The search is to include all rooms, attics, and other parts within the residence and its curtilage, to include all vehicles, trash containers and storage areas. There are no house numbers visible on the exterior, however as one enters the Vista del Valle community from El Llano Road, the Premises is the last house on the left (see Paragraph 27). Color photographs of the Subject Premises have been attached to Attachment A and incorporated herein.



8



# Attachment A continued



9

KBM

# Attachment B

### Items to Be Seized

### 1811 Vista del Valle Española, New Mexico

**All evidence of violations of Title 18 USC § 2 and 922 (g)(1) and Titles 21 USC § 841 and 846, including but not limited to the following items:**

a) Controlled substances, including but not limited to heroin; and drug paraphernalia and packaging materials, including but not limited to: scales, plastic baggies, and tape.

b) Firearms and ammunition.

c) Books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing and/or distributing controlled substances, stored in any form, including electronic form.

d) Documentation – in print or electronic form - pertaining to SNM Gang-related membership rosters, "green light"/disciplinary lists, murder/assault lists, moniker or alias lists, promotion lists, inmate lists, money order/wire transfer receipts, shipping/mailing receipts, accounting and narcotics ledgers, address/telephone number lists, letters, police reports, and legal documents.

e) Financial documents, including but not limited to, credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union Money Gram or other currency transfer receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money, stored in any form, including electronic form.

f) Records, including but not limited to, address and telephone books (electronic or otherwise), telephone bills, cellular telephones, pagers, airline tickets, rental car records, storage unit rental records, false identification, other forms of identification, vehicle titles, vehicle registrations, records showing occupancy of the premises, utility bills, receipts showing the purchase of chemicals and/or motel records, stored in any form, including electronic form.

g) Proceeds of violations of 21 USC §§ 841 and 846, including but not limited to, currency, jewelry, vehicles and other assets or financial records related thereto.

h) Photographs and/or videotapes including but not limited to photographs and/or video tapes of coconspirators, assets and/or controlled substances, stored in any form, including electronic form.

i) Cellular telephones and their contents, to include but not limited to: phone book or contacts list, call history, text messaging, audio/video files, photographs, and any other material stored on the telephones that is related to the above listed offenses.

10